NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

GRACIELA E., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, N.E., Y.S., R.E., *Appellees*.

No. 1 CA-JV 20-0336
FILED 4-27-2021

Appeal from the Superior Court in Maricopa County
No. JD529764
The Honorable Cassie Bray Woo, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Eric Devany
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Maria Elena Cruz joined.

---

H O W E, Judge:

¶1            Graciela E. ("Mother") appeals the juvenile court's order terminating her parental rights to her children, N.E., Y.S., and R.E. For the following reasons, we affirm.[1]

## FACTS AND PROCEDURAL HISTORY

¶2            We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). In May 2014, Mother's six-year-old daughter, N.E., made Y.S., her 13-month-old sister, a bottle using fabric softener rather than powdered formula. When Mother noticed N.E.'s mistake, she dragged her into her bedroom by the hair, forced her to lay face down on the bed, and repeatedly hit her back. At one point, N.E. turned and asked Mother to stop, but Mother repositioned herself on N.E.'s shoulders, struck her face with "a good strong hit" leaving a three-inch bruise, and continued to hit the back of her head. Mother called N.E.'s grandmother to come and care for the children after the incident. When grandmother noticed N.E.'s facial contusion, she called the police, who arrested Mother. Mother pled guilty to child abuse and was placed on three years' probation, and ordered to have no contact with N.E.

¶3            In January 2016, staff at N.E.'s school reported that N.E. had bruises on her forearms and a bite mark. N.E. said that she had bitten herself because Mother had called her stupid and a moron. Despite Mother's not being allowed to have contact with her, N.E. said that she went "back and forth" between her Mother's and grandmother's homes. She also said that Mother's boyfriend sexually abused her. Mother told the police that N.E. was lying, and that N.E.'s grandmother's boyfriend had touched her. The

---

[1]       Each child has a different father, none of which are subject to this appeal.

Department took N.E. and Y.S. into care, petitioned for dependency in February 2016, and the court found the children dependent.

¶4         The Department offered Mother, N.E., and Y.S. a multitude of psychological and therapy services. It also offered Mother parenting classes, case-aide services, supervised-visitation, unsupervised visitation, and three parent-aides. During her first parent-aide service, however, Mother hit Y.S. in front of the parent-aide and was closed out of the parent-aide service. Mother completed her initial psychological evaluation in July 2017. The psychologist expressed concern about her past physical and sexual trauma and unhealthy relationships and diagnosed her with borderline intellectual functioning and dependent personality traits. During the ensuing individual counseling, Mother re-engaged a friendship with a person she had met while incarcerated and whom she admitted was a danger to her children.

¶5         At the second parent-aide intake, all of Mother's parenting capacities remained diminished. During the second parent-aide service in January 2018, she gave birth to R.E. The Department removed R.E. from her care and petitioned for dependency, asserting that she had not completed treatment related to her abuse of N.E. The trial court found R.E. dependent and R.E. joined Y.S. and N.E. in the parent-aide service. Mother struggled to manage all three children and insisted that the parenting techniques that she had learned were not helpful.

¶6         The Department also provided Mother with supervision-only and case-aide supervised visits with all three children and provided unsupervised one-on-one visits with R.E. Mother often cancelled her unsupervised one-on-one visits with R.E. because she did not have time for them. A case aide had to intervene so that the children remained safely and properly supervised, which prompted Mother to again express concern about her own ability to supervise all the children.

¶7         Family counseling sessions with Mother, N.E., and Y.S. ended a month after they began because N.E.'s negative behaviors had dramatically increased, leading a psychologist to recommend against family counseling for both N.E. and Y.S. The first bonding and best-interests analysis occurred and the evaluator, Dr. Silberman, opined that the Department had exhausted services that Mother could receive, that providing any more services would be futile, and that severance and adoption should be pursued. The second evaluator, Dr. Mastikian, agreed, stating that Mother continued to exhibit characteristics similar to known and active child abusers. Mother sought out her own personal therapist and

an independent best interests and bonding evaluator, both of whom suggested immediate reunification and no further evaluations.

¶8 The children's psychologist diagnosed N.E. with an intellectual disability and Y.S. with language difficulty and hyperactivity and opined that severance and adoption was the most appropriate plan for the children. Based on Mother's lack of progress over the years and the results of the bonding and best interests analysis, the Department petitioned to terminate Mother's parental rights to N.E. and Y.S. under A.R.S. § 8–533(B)(2), a parent willfully abused a child, and to terminate Mother's parental rights to N.E., Y.S., and R.E. under § 8–533(B)(8)(c), fifteen months in out-of-home placement.

¶9 The juvenile court began the termination hearing in November 2019. The Department's case manager testified that termination and adoption was in the children's best interests. R.E. was in adoptive placement, and while N.E. and Y.S. were not in adoptive placements, two homes were being assessed for N.E., making adoption likely, and an adoptive placement had been found for Y.S. She further testified that she believed N.E. would consent to adoption if termination occurred.

¶10 Dr. Silberman testified that Mother minimized the extent of N.E.'s abuse, which kept Mother from changing her abusive behavior. He recommended that the children not be returned to Mother because she was likely to again abuse the children. After the first day of the hearing, the State requested and received a continuance because its psychologists had reviewed current counseling records and requested that Mother receive an updated psychological evaluation to "assess the progress of therapy and the extent to which she has been able to put to use the skills that she has learned in therapy."

¶11 The Department referred Mother to Dr. Thal for the updated evaluation. Dr. Thal diagnosed Mother with, among other things, unspecified intellectual disorder and generalized anxiety disorder. He concluded that Mother's combination of borderline cognitive ability, stress disorder, and inability to adapt to her children's evolving needs made her ability to adequately care for and control the children, or any one individually, "poor" and that her limitations were too major to justify placing any of her children in her care. He further opined that additional services would be futile.

¶12 The Department also referred Mother to a third parent-aide service. The case manager reported that Mother's parenting capacities

remained diminished at the intake. The parent-aide reported that at the midpoint of the service, Mother failed to respond to her children's needs and did not recognize that she must make those needs a priority. The report further stated that Mother had minimal skills to provide for the children's basic needs and did not acknowledge her lack of flexibility or adaptability in caregiving. By June 2020, Mother had not improved and was unsuccessfully closed out of the parent-aide service.

¶13            The termination hearing resumed in July 2020. The children's psychologist testified that Mother's borderline intellectual functioning made understanding and implementing parental techniques difficult for her and that Y.S. and N.E. would be subject to abuse if returned to Mother. Dr. Thal disagreed with Mother's psychologist's opinion that she was not a threat to commit future abuse, stating that her limited financial and cognitive resources kept her from adapting to her children's new needs and behaviors. He concluded that while Mother greatly loved her children, her borderline stress tolerance and intellectual disability made caring for the children likely overwhelming and opined that the children would likely be subject to abuse or neglect. The Department's case manager testified that despite the additional services during the hearing, Mother still struggled to provide adequate supervision, had not addressed her frustration tolerance, and had been unable to make realistic plans for childcare.

¶14            Mother testified that she could provide her children stability and address their needs and that returning them to her care was in their best interests. She had attended the required meetings for her children, would not allow grandmother to have contact with the children, and would implement a safety plan. To address N.E.'s and Y.S.'s sexualized behaviors, she would not allow the children to sleep in the same room. She further testified that she would change her work schedule to accommodate the children's needs, had looked into childcare options, and had identified familial support to assist her with childcare.

¶15            The juvenile court terminated Mother's rights to N.E., Y.S., and R.E. under both the fifteen months in out-of-home placement and willful abuse grounds. The court also found that severance was in the children's best interests because continuing the parent-child relationship would be harmful to them and terminating the relationship would benefit them. Mother timely appealed.

**DISCUSSION**

¶16 Mother argues that the court erred in terminating her rights and finding that termination was in the children's best interests. A juvenile court's termination determination is reviewed for an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004). To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one statutory ground under A.R.S. § 8–533 and by a preponderance of the evidence that termination would be in the child's best interests. A.R.S. § 8–533(B); Ariz. R.P. Juv. Ct. 66(C); *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). Because the juvenile court is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts, *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004), we will affirm a termination decision unless no reasonable evidence supports it, *Xavier R. v. Joseph R.*, 230 Ariz. 96, 100 ¶ 11 (App. 2012).

## I.  Termination of Mother's Parental Rights

¶17 To terminate parental rights for fifteen months in an out-of-home placement, the juvenile court must find clear and convincing evidence that (1) the Department made diligent efforts to provide appropriate reunification services, (2) the child has been in an out-of-home placement for a cumulative total period of 15 months or longer pursuant to court order, (3) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement, and (4) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c).

¶18 Reasonable evidence supports the court's order terminating Mother's parental rights. The children have been in an out-of-home placement for more than fifteen months and the Department diligently offered Mother services for more than four years. Despite the services, Mother had failed to make the necessary progress to care for the children and her ability to do so in the near future is poor. Reasonable evidence demonstrates any further services would be futile.

¶19 Mother argues, however, that insufficient evidence supports the juvenile court's findings that she was provided adequate services, especially for R.E. Contrary to Mother's argument, however, the Department diligently offered Mother additional services to help her learn to parent R.E., but she did not fully participate in them. Furthermore, Dr. Silberman and Dr. Thal testified that any further services would have

been futile. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235 ¶¶ 14–15 (App. 2011) (stating that the Department is not required "to provide every conceivable service or to ensure that a parent participates in each service it offers" and that it is "not required to provide services that are futile").

**¶20**        Mother also argues that the Department did not meet its burden that she had failed to remedy the circumstances that caused the children to be in an out-of-home placement and that a substantial likelihood existed that she would be incapable of exercising proper and effective parental care and control in the near future, especially with R.E. She argues that her best interests and bonding evaluator opined that she had ameliorated any real or perceived parental shortcomings and that her personal therapist testified that she had addressed her history of abuse and its effect on her parenting. This argument, however, requires us to reweigh the evidence before the trial court, which we will not do. *See Williams v. King*, 248 Ariz. 311, 317 ¶ 26 (App. 2020). Reasonable evidence supports the juvenile court's determination. Because we find that the court did not abuse its discretion by terminating Mother's parental rights under the 15 months' out-of-home placement ground, we need not address the other grounds for termination and correlating arguments. *See Jennifer S.*, 240 Ariz. at 286 ¶ 15.

## II.        Best Interests Findings

**¶21**        If the juvenile court finds grounds for termination, it then must determine if termination of the parent-child relationship is in the children's best interests by a preponderance of the evidence. A.R.S. § 8–533(A). The Department can establish best interests either by showing that the child will benefit from termination of the relationship or that the child would be harmed by continuing the parental relationship. *Oscar O.*, 209 Ariz. at 334 ¶ 6. Relevant factors include whether the current placement is meeting the child's needs, an adoption plan is in place, and the child is adoptable. *Demetrius L.*, 239 Ariz. at 3–4 ¶ 12. The court presumes that the interest of the parent and child have diverged once one of the statutory grounds for termination has been proved. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 12 (2018).

**¶22**        The juvenile court considered the totality of the circumstances and determined that the children would benefit from the termination and that the children would have incurred a detriment if reunited with Mother. Both Y.S. and N.E. acted out negatively after family counseling with Mother. Dr. Thal and the children's psychologist opined that the children would suffer harm if returned to Mother's care because she would subject

the children to further physical abuse and unhealthy relationships. The case manager testified that R.E. was in an adoptive placement and that the Department had an adoptive home ready for Y.S. She also testified that the Department was conducting two home studies and that the Department would likely find an adoptive placement for N.E. from one of those two homes. Evidence supports the juvenile court's determination.

¶23 Mother argues, however, that the Department failed to prove that N.E. would be adopted since consent is a prerequisite for adoption when a child is older than 12, citing A.R.S. § 8–106(A)(3), and that the Department failed to show how N.E. would be at risk for harm if her rights were not terminated. The Department's case manager testified, however, that based on her conversations with N.E., N.E. would likely consent to adoption after termination, and we will not re-weigh this testimony. *See Oscar O.*, 209 Ariz. at 334 ¶ 4. Moreover, the record supports the finding that N.E. would suffer a detriment if she returned to Mother's care, which independently supports the juvenile court's finding that termination was in N.E.'s best interest. *Id.* at 334 ¶ 6.

¶24 Mother also argued that while R.E. was in an adoptive placement and the Department had an adoptive placement ready for Y.S., the record did not support a finding that either would suffer a detriment in Mother's care. Both arguments ask the Court to re-weigh the evidence, which we will not do. *See id.* at 334 ¶ 4. Moreover, the juvenile court found that both R.E. and Y.S. would benefit from the severance, which Mother does not refute in her brief, and the Department was not required to also show that they would suffer a detriment if returned to Mother. *See id.* at 334 ¶ 6.

## CONCLUSION

¶25 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA